***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The following findings of fact and conclusions of law were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-trial Agreement as:
 STIPULATIONS
1. The employee is Donald D. Wilson.
2. The employer is Alex Lee/Lowe's Foods.
3. Carrier is Kemper Risk Management Services.
 4. Defendant-employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act.
 5. The employer-employee relationship existed between defendant-employer and plaintiff on 7 October 1999, and during the previous periods of employment during which plaintiff developed bilateral carpal tunnel syndrome. It is not stipulated that plaintiff developed bilateral carpal tunnel as a result of his employment.
 6. In the period 7 October 1999 through the present time the carrier on the risk for defendant-employer was Kemper Risk Management Services.
 7. The average weekly wage of plaintiff is $588.32 pursuant to defendant's Industrial Commission Form 22.
8. Documents stipulated into evidence include the following:
a. Stipulated Exhibit No. 1 — Plaintiff's medical records
 b. Stipulated Exhibit No. 2 — Defendant's answers to plaintiff's interrogatories
c. Stipulated Exhibit No. 3 — Industrial Commission Form 22
 *********** EVIDENTARY RULINGS
The objections raised in the depositions are ruled upon according to the law and consistent with this Opinion and Award.
 ***********
Based upon all the competent credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 56 years old and had been employed by defendant-employer since August 1966.
2. Plaintiff began working for defendant-employer as a grocery bagger and worked as such for the next two or three years at which time he began working as a meat cutter. From that point up to the time of the hearing before the Deputy Commissioner, plaintiff has worked as a meat cutter for defendant-employer at various store locations.
3. During his employment with defendant-employer, plaintiff worked at least 40 hours a week and has worked overtime during a number of weeks. On occasion, plaintiff worked six or seven days per week, and at the time of the hearing before the Deputy Commissioner, he had worked fifteen days in a row. Plaintiff also worked nine-hour days on occasion.
4. During plaintiff's tenure of employment with defendant-employer, the volume of meat needing to be cut increased. As a meat cutter, plaintiff was required to use several different types of knives as well as a band saw to cut the various types of meat. Plaintiff used a knife for most of his cutting. The cuts of meat such as a full cut round weighed 20 to 30 pounds, and bone-in chuck weighed about 50 pounds. The various types of meat had to be carried to the cutting table by plaintiff.
5. Plaintiff's job duties included having to trim fat off of the meat using a knife, using his dominant right hand to cut with a horizontal motion and his left hand to pull the fat. Plaintiff's job duties included cutting meat using a knife with a vertical rocking motion, and with a band saw that he used to cut down some larger pieces of meat into smaller cuts. For example, for a full cut round piece of meat, plaintiff would cut it into about 15 slices. For rib-eyes, he would cut 20-25 steaks from the larger piece of meat. This required plaintiff to exert pressure on the knife with his right hand while applying pressure to hold the meat with his left hand. When using a band saw plaintiff had to push and pull on the meat with his hands as the saw cut through meat and bone. Plaintiff also had to scrape and clean the meat to remove bone chips and dust.
6. Plaintiff cut several pieces of different kinds of meat. Plaintiff cut 30 steaks out of each T-bone loin by using a band saw. For a 30-pound boneless chuck, plaintiff cut "chuck eyes", a 2-inch piece of meat, chuck roasts, chuck steaks, and then several beef stew pieces. He would cut three to four chuck roasts and three to four chuck steaks per 30-pound boneless chuck. With boneless pork, plaintiff would cut several boneless pork chops then several wafer thin slices. With bone-in pork, plaintiff cut about nine pork chops through the band saw. Plaintiff also cut Boston butt steaks, southern style, roast beef and beef tips, all using a knife or the band saw.
7. In his job as a meat cutter, plaintiff also stacked and wrapped the meat and placed packages of meat in the display case and checked for freshness dates. Most of his day, however, was spent cutting the various types of meat. Plaintiff's job required him to perform repetitive hand, wrist, and arm motions most of the time spent each working day during the past approximately 30 years that he has been employed by defendant-employer as a meat cutter.
8. Approximately eight or nine years prior to the date of hearing before the Deputy Commissioner, plaintiff began to notice a tingling in his hands and the tips of his fingers. Plaintiff sought a medical evaluation for this problem around the Spring of 1999 with his family physician, Dr. Tom Cannon. Dr. Cannon referred plaintiff to Smith 
Bey P.A., neurologists, for nerve conduction studies, the results of which indicated bilateral carpal tunnel syndrome.
9. Plaintiff was then referred to Dr. Stephen Lowe, a board-certified orthopedic surgeon since 1983, who is competent to express opinions as to the etiology and prognosis of plaintiff's carpal tunnel syndrome condition. Dr. Lowe first saw plaintiff on 27 September 1999, at which time plaintiff complained of numbness in his hands which kept him awake at night, and decreased sensation in the median nerve distribution and positive percussion test over his median nerve on both hands. Based upon his testing and studies, Dr. Lowe concluded that plaintiff had compression of the median nerve or carpal tunnel in both hands.
10. Dr. Lowe has treated plaintiff for a number of years, including treatment for a right knee injury. Plaintiff has described his work requirements to Dr. Lowe, and Dr. Lowe is familiar with plaintiff's job duties. Dr. Lowe opined to a reasonable degree of medical certainty that plaintiff's problems with bilateral carpal tunnel syndrome was caused by his occupational exposure to the heavy repetitive work with his hands. He further opined that the stress caused by the repetitive motion was a result of conditions peculiar to plaintiff's occupation as a meat cutter and not an ordinary disease of life to which the general public is equally exposed.
11. Dr. Lowe performed carpal tunnel release surgery on plaintiff's right hand on 2 November 2000, and as a result of that surgery, plaintiff missed six weeks from work and was unable to earn any wages during that period of time. Dr. Lowe recommended that plaintiff's left hand needs the same carpal tunnel release surgery.
12. Dr. Lowe is not able to assign plaintiff a permanent partial disability rating as of yet, but he indicated that he would be able to do so in the future.
13. Plaintiff received medical treatment related to and resulting from his bilateral carpal tunnel syndrome that was reasonably necessary to effect a cure, provide relief to plaintiff and to lessen the period of disability resulting from said condition.
14. Plaintiff testified that he had not had the surgery performed on his left hand because of the financial hardship it would create for his family during the time he would be out of work. The surgery recommended by Dr. Lowe to treat plaintiff's carpal tunnel syndrome of his left hand is reasonably necessary to effect a cure, provide relief to plaintiff and to lessen the period of disability resulting from said injury.
15. Alan Gorrod, an ergonomics expert and occupational therapist, spent two and one-half hours in one of defendant-employer's meat cutting departments in order to evaluate the job of meat cutter. Mr. Gorrod did not observe plaintiff, nor had he reviewed plaintiff's deposition regarding his job activities. He has evaluated approximately 25 meat cutter positions, five of which have been in a retail setting such as defendant-employer.
16. As a result of his ergonomic job analysis, Mr. Gorrod ultimately concluded that plaintiff's job as a meat cutter presented a low presence of ergonomic risk factors which would contribute to the onset of diagnoses within the cumulative trauma disorder category, including carpal tunnel syndrome. During his deposition, Mr. Gorrod was asked to express an opinion to a reasonable degree of medical certainty as to whether or not plaintiff's job could have caused or exacerbated his carpal tunnel syndrome. Mr. Gorrod testified that, from an ergonomic standpoint, that plaintiff's job did not demonstrate the excessive types of extremes that would create such a problem as carpal tunnel syndrome.
17. The Full Commission finds that, while Mr. Gorrod is qualified to evaluate and assess jobs from an ergonomic standpoint, he is not qualified to express opinions as to the causation of medical conditions. His opinion as to the same is therefore given little weight. Further, at the deposition of Dr. Lowe defendants provided him with the ergonomic study prepared by Mr. Gorrod. Dr. Lowe reviewed the study and opined that while it contained some descriptions of plaintiff's job which were different from Dr. Lowe's initial impressions, the study did not cause him to alter his opinion regarding causation or the increased risk of developing carpal tunnel syndrome posed by plaintiff's job duties. Therefore, greater weight is assigned to the testimony of Dr. Stephen Lowe as to causation of plaintiff's carpal tunnel syndrome and the increased risk of developing the occupational disease posed by his employment with defendant-employer over that of the general public.
18. Plaintiff has proven by the greater weight of the evidence that he developed an occupational disease, bilateral carpal tunnel syndrome, as a result of his employment with defendant-employer, and that his employment with defendant-employer placed him at an increased risk for acquiring and developing bilateral carpal tunnel syndrome as compared to members of the general public.
19. Dr. Lowe is qualified and competent to treat plaintiff for his bilateral carpal tunnel syndrome.
20. The Form 22 Wage Chart provided by defendants and stipulated to by the parties indicates plaintiff's average weekly wage was $588.32, allowing for a weekly compensation rate of $392.21.
21. For the six weeks during which plaintiff was unable to earn wages following the carpal tunnel surgery on 2 November 2000, defendants paid plaintiff half his regular pay rate from a wage continuation program funded by defendant-employer.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's acquisition and aggravation of his bilateral carpal tunnel syndrome is causally related to his employment as a meat cutter with defendant-employer, is due to causes and conditions characteristic of and peculiar to his employment with defendant-employer, is not an ordinary disease of life to which the general public is equally exposed, and constitutes an occupational disease. N.C. Gen. Stat. § 97-53(13).
2. As a result of his contraction of bilateral carpal tunnel syndrome, plaintiff is entitled to temporary total disability compensation at the rate of $392.21 per week for the six weeks including and following plaintiff's right carpal tunnel release surgery on 2 November 2000. N.C. Gen. Stat. § 97-29.
3. As a result of his contraction of bilateral carpal tunnel syndrome, plaintiff has received medical treatment and is entitled to receive further medical treatment that would effect a cure, give relief or lessen his period of disability. This treatment includes the carpal tunnel releases for each wrist as prescribed by Dr. Stephen Lowe. Plaintiff is entitled to have defendants pay for the prescribed surgery on his left hand as soon as the same can be scheduled. N.C. Gen. Stat. § 97-25.
4. It has yet to be determined what, if any, permanent partial disability plaintiff may have sustained as a result of his acquisition and aggravation of bilateral carpal tunnel syndrome. N.C. Gen. Stat. § 97-31.
5. Defendants are entitled to a credit for partial wages paid to plaintiff from an employer-funded wage continuation program following the 2 November 2000 surgery. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. For his compensable bilateral carpal tunnel syndrome, defendants shall pay temporary total disability compensation to plaintiff at the rate of $392.21 per week for the six weeks including and following plaintiff's right carpal tunnel release surgery on 2 November 2000. Said amount shall be paid in one lump sum, subject to a credit for partial wages paid by defendant-employer during that time and attorney's fees approved below.
2. Defendants shall pay all medical expenses heretofore incurred and to be incurred as a result of plaintiff's contraction of bilateral carpal tunnel syndrome that is reasonably necessary to effect a cure, give relief or shorten the period of disability, including the recommended left carpal tunnel release surgery recommended by Dr. Stephen Lowe. Dr. Stephen Lowe shall be assigned as plaintiff's primary treating physician for the treatment of plaintiff's condition.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff under Paragraph 1 of this AWARD is hereby approved for plaintiff's counsel and shall be paid as follows: 25% of the sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel.
Defendants shall pay the costs of this action.
This the ___ day of May, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER